# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY J. SIKIRICA, ESQUIRE,<br>Chapter 7 Trustee,<br><br>         Appellee,<br>   v.<br><br>THOMAS C. WETTACH and BETTE C.<br>WETTACH,<br><br>         Appellants. | Civil Action No. 13-1822<br>Judge Nora Barry Fischer<br><br>Appeal Related to Bankruptcy Case<br>No. 05-38188-TPA and Adversary<br>No. 07-02519-TPA |

## **MEMORANDUM OPINION**

### I. INTRODUCTION

Pending before the Court is an appeal of a Memorandum Opinion and Order issued by the Bankruptcy Court in Adversary Proceeding No. 07-2519 on March 26, 2013. (Docket No. 1). Appellants Thomas Wettach ("Wettach") and Bette Wettach (collectively, "the Wettachs") appeal the Bankruptcy Court's determination that Wettach fraudulently transferred $428,868.12 in assets in violation of the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. §§ 5101 *et. seq* ("PUFTA"). The Wettachs also appeal a separate order issued by the Bankruptcy Court on November 12, 2013, awarding $37,139.01 in prejudgment interest. Based on the following, the Court will AFFIRM the decisions of the Bankruptcy Court in all respects.

### II. FACTUAL BACKGROUND

As the Bankruptcy Court has fully set forth the factual background in its findings of fact and conclusions of law supporting its decision, the Court restates only the facts pertinent to the

instant appeal. Prior to 1999, Wettach was a partner and shareholder of Titus & McConomy ("Titus" or "the Titus firm"), a law firm located in Pittsburgh, Pennsylvania. (Docket No. 1-28 at 3). Following the Titus firm's dissolution in 1999, Wettach became a shareholder and employee in the law firm of Cohen & Grigsby. (*Id*. at 7). From at least 2001 through 2005, Wettach's wages from Cohen & Grigsby were directly deposited into a bank account that he jointly owned with his wife as tenants by the entireties. (*Id*.).

Prior to the Titus firm's dissolution, the firm had rented office space from Trizechahn Gateway LLC ("Trizec") pursuant to a long-term lease agreement. (*Id*. at 3). In 2000, Trizec filed a breach of contract action against the Titus firm's former partners over unpaid rent due under the lease. (*Id*.). That action culminated in a judgment against Wettach and several other partners jointly and severally in the amount of $2,700,000, plus interest and costs. (*Id*. at 4). As a result of that judgment, several former partners of the Titus firm became involved in bankruptcy proceedings in this district.[1] Two of those proceedings involved Wettach: his own Chapter 7 bankruptcy petition, filed on October 14, 2005, and the adversarial proceeding filed by the Trustee on October 15, 2007.

Wettach's bankruptcy petition listed assets with a total value of $2,951,000 including personal property, retirement accounts, insurance policies, and the contents of a PNC checking account. (*Id*. at 4-5). Wettach claimed all of the listed property as exempt, primarily on the basis that it was jointly owned with his wife as entireties property. (*Id*. at 5). The Trustee filed objections to the petition on May 16, 2006, and commenced the related adversarial proceeding

---

[1] *See, e.g., Cardiello v. Arbogast (In re Arbogast)*, 466 B.R. 287 (Bankr. W.D. Pa. 2012), *aff'd*, 479 B.R. 661 (W.D. Pa. 2012), *aff'd*, 2013 WL 4007772 (3rd Cir. 2013); *Sikirica v. Cohen (In re Cohen)*, 2012 WL 5360956 (Bankr. W.D. Pa. Oct. 31, 2012), *aff'd in part, rev'd in part*, 487 B.R. 615 (W.D. Pa. 2013); *Shearer v. Oberdick (In re Oberdick)*, 490 B.R. 687, 703 (Bankr. W.D. Pa. 2013); *Titus v. Shearer (In re Titus)*, 498 B.R. 508 (W.D. Pa. 2013).

on October 15, 2007.[2] The primary allegation in the adversarial proceeding was that Wettach had engaged in fraudulent transfers by directing his individual compensation to be deposited into a jointly owned entireties account for the purpose of shielding his individual compensation from the reach of his creditors.

The Trustee's objections to Wettach's exemptions and the issues raised in the adversarial proceeding were tried together on November 30, 2011. On March 26, 2013, the Bankruptcy Court issued a Memorandum Opinion and Order finding in favor of the Trustee and awarding $428,868.12 in damages. On November 12, 2013, the Bankruptcy Court awarded an additional $37,139.01 in prejudgment interest. The instant appeal ensued.

## IV. LEGAL STANDARD

This Court has appellate jurisdiction over final judgments, orders and decrees of a bankruptcy court pursuant to 28 U.S.C. § 158(a)(1). The Court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law under a de novo standard. *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 (3rd Cir. 2006).

## IV. DISCUSSION

As noted above, the amended complaint in the underlying adversarial proceeding alleged that Wettach's direct deposits of his wages from Cohen & Grigsby into a jointly owned bank account amounted to fraudulent transfers in violation of 12 Pa. C.S.A. §§ 5104(a)(2)(ii) and 5105. (Docket No. 1-8). Section 5104(a)(2)(ii) provides that:

---

[2] The operative amended complaint, filed on February 14, 2010, contained three counts: fraudulent transfer with actual intent pursuant to 12 Pa.C.S.A. §5104(a)(1) (Count I); fraudulent transfer with constructive intent pursuant to 12 Pa.C.S.A. §5104(a)(2)(ii) (Count II); and, fraudulent transfer with constructive intent pursuant to 12 Pa.C.S.A. §5105 (Count III). 11 U.S.C. § 544(b)(1) authorizes a Trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable [nonbankruptcy] law by a creditor holding an unsecured claim [against the bankruptcy estate]."

3

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or the obligation, and the debtor . . . intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa. C.S.A. § 5104(a)(2)(ii). Similarly, Section 5105 provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 Pa. C.S.A. § 5105. In other words, a direct deposit of wages into a jointly held bank account is generally considered to be a fraudulent transfer if the debtor was insolvent at the time of the transfer and the debtor failed to receive "reasonably equivalent value" in return. *In re Meinen*, 232 B.R. 827, 842-43 (Bankr. W.D. Pa. 1999). However, such a deposit is not a fraudulent transfer to the extent that "said funds are then used to satisfy reasonable and necessary expenses for the maintenance of said debtor's family." *Id.; see also In re Titus*, 498 B.R. at 515-16 ("Under the PUFTA, entireties account funds used to pay for 'reasonable and necessary household expenses' are not fraudulent.").

In its Memorandum Opinion, the Bankruptcy Court concluded that Wettach had transferred $933,472 in individual wages into the entireties account during the operative lookback period. (Docket No. 1-28 at 22). Of that total amount, the Bankruptcy Court determined that $380,253.87 was not used to satisfy reasonable and necessary household expenses. (*Id*. at 35). The court also awarded the Trustee $39,264.25 from balances held by the Wettachs in other bank accounts and $9,350 from Wettach's severance benefits. (*Id*. at 39, 46).

4

Finally, the Bankruptcy Court awarded $37,139.01 in pre-judgment interest. (Docket No. 1-40). In this appeal, the Wettachs attack those determinations on several grounds. Each will be discussed, in turn.

**A. Burden of Proof**

Wettach first contends that the Bankruptcy Court erred by improperly shifting the burden of proving that no money was deposited into the joint checking account other than Wettach's individual wages and that the relevant deposits into the joint checking account were not spent on necessary household expenses from the Trustee to the Wettachs. (Docket No. 4 at 7). As this is a question of law, the Court reviews the Bankruptcy Court's decision *de novo*.

It is well-established that "the Trustee ha[s] the burden of proof on all elements of . . . PUFTA claims, including whether funds were spent on necessities." *In re Titus*, 498 B.R. at 519; *see also In re Arbogast*, 466 B.R. at 308-09 (holding that the Trustee must "preponderantly prove that the direct deposits of the Debtor's compensation into the Entirety Checking Account . . . were not used to satisfy necessities"). However, the Bankruptcy Court may shift the "burden of producing at least some useful evidence regarding what the funds deposited into [the] entireties bank account [were] ultimately spent on" to the defendants. *In re Titus*, 498 B.R. at 519-20; *In re Cohen*, 487 B.R. at 621 (affirming the bankruptcy court's approach of keeping the burden of proof on the Trustee but shifting the burden of producing some relevant evidence to the defendants).

In the instant case, the Bankruptcy Court adopted the following burden of proof:

> [T]he Trustee must prove by a preponderance of the evidence that the Debtor caused the transfers in question to be made into an entireties' account or other entireties' property. He must also show by a preponderance of the evidence that the Debtor failed to receive

> reasonably equivalent value in exchange for the transfer of his individual compensation into entireties' property, or, in other words, the Trustee must show that the transferred funds were not used to satisfy necessities or were spent on other assets that are presently held as entireties' property. The Trustee must also prove by a preponderance of the evidence that the Debtor was insolvent at the time of the transfers, or was thereby rendered insolvent. The [Wettachs], however, have the burden of producing at least some useful evidence to demonstrate how they spent the transferred funds, and absent such evidence the Trustee will be deemed to have met his burden of proof as to reasonably equivalent value.

(Docket No. 1-28 at 11). This formulation is identical to that which has been utilized and endorsed repeatedly by courts in this district. *See, e.g., In re Arbogast*, 479 B.R. at 666; *In re Cohen*, 487 B.R. at 621; *In re Titus*, 498 B.R. at 519-20. Accordingly, the Bankruptcy Court's ruling on this issue will be affirmed.

### B. Sufficiency of Evidence Regarding the Amount of Deposits

Wettach next asserts that the Trustee failed to meet his burden of proving: (1) that Wettach deposited any wages at all into the jointly owned checking account; and (2) that the amount of wages allegedly deposited within the relevant lookback period was sufficient to cover any non-necessary expenditures.[3] (Docket No. 4 at 8-9). Wettach notes that the Trustee possessed – but failed to introduce – an exhibit at trial that would have provided direct evidence of Wettach's individual deposits into the joint bank account. (*Id.*). In the absence of this exhibit, Wettach contends that no evidence supported the Bankruptcy Court's conclusion that he deposited $933,472 in wages into the joint account. (*Id.* at 10). The Court reviews the Bankruptcy Court's factual determination for clear error.

---

[3] Applying the four-year "lookback period" set forth in 12 Pa. C.S.A. § 5109, the Bankruptcy Court determined that the relevant transfers must have occurred between October 14, 2001 and October 14, 2005. (Docket No. 1-28 at 15-16).

6

With respect to Wettach's first objection, the Bankruptcy Court correctly observed that Wettach's own answer to the amended complaint contains an admission that all of his individual wages were deposited into the entireties account. (Docket No. 1-28 at 19). Wettach reiterated this admission at trial during the following exchange:

> Q: Okay. And the income you generated in these years [2001-2005] was deposited into your joint account at PNC?
>
> A: The firm deposited money into the account.
>
> Q: It was deposited into your account at PNC by your firm, because you directed that they deposit it there. They didn't do it because they thought it was a good idea. They did it because you directed them to.
>
> A: They asked me how I wanted it done.
>
> Q: And you told them?
>
> A: I agree, that's the way I preferred it.

(Docket No. 1-22 at 120). Based on these admissions, the Bankruptcy Court held that "[t]he fact of the Debtor's deposit of his [Cohen & Grigsby] compensation into an entireties' account is clearly established by the record." (Docket No. 1-28 at 19). We agree.

Turning to the amount of the deposits, the Bankruptcy Court relied entirely on Wettach's income tax returns to demonstrate that he earned $376,358; $202,122; $365,305; $242,597; and $216,334, for the years of 2001 to 2005, respectively. (*Id*. at 20). In order to account for the fact that portions of the years 2001 and 2005 fell outside of the lookback period, the Bankruptcy Court equitably apportioned the income for those years and included only half of the *pro rata* amount. (*Id*. at 21). Based on these calculations, the Bankruptcy Court concluded that "the Trustee has proven potentially actionable deposits of $933,472 into the PNC entireties' account during the lookback period." (*Id*. at 22). The Bankruptcy Court acknowledged that this approach to the calculations was somewhat arbitrary, but noted that, in light of its subsequent

7

determination that only $380,253.87 of the money deposited into the entireties account was spent on non-necessities (and, consequently, was recoverable by the Trustee), the precise amount of the deposits "does not really impact the final decision so long as the amount is above the $380,000 level." (*Id*. at 21 n. 13).

Wettach attacks the Bankruptcy Court's reliance on his tax returns to establish the deposit amounts, noting in particular that the Bankruptcy Court utilized gross wages, rather than net wages, in making its calculations. (Docket No. 4 at 10). Wettach correctly notes that gross wages are subject to various withholdings such as income tax, social security tax, health care, and pensions. (*Id*.). As such, they do not necessarily reflect actual deposits into the joint account. (*Id*.). However, in his bankruptcy petition, Wettach indicated that his total tax and payroll deductions were approximately $8,500 per month, based on a $25,000 monthly income. Extrapolating from this figure, Wettach's total payroll deductions during the lookback period would have amounted to roughly $408,000, leaving approximately $535,472 in wages available for deposit into the joint account. This amount would still easily exceed the $380,253.87 in unnecessary expenditures determined by the Bankruptcy Court.

The Bankruptcy Court's conclusion is further bolstered by the testimony of Wettach and his wife, Bette, to the effect that Bette did not make any deposits into the joint account at all during the lookback period. (Docket No. 1-22 at 119, 162; Docket No. 1-28 at 20). Consequently, the only deposits made into the PNC joint account during the lookback period necessarily consisted entirely of Wettach's compensation from Cohen & Grigsby.[4] Simply put, the $380,253.87 in unnecessary purchases paid from the joint account had to have derived from Wettach's wages because no other funds were deposited into the account during that time period.

---

[4] The Bankruptcy Court did not permit the Trustee to seek recovery of the only other deposit entered during that time, an inheritance of $66,722.62 from Wettach's father. (Docket No. 1-28 at 21-22).

In sum, while the Bankruptcy Court's findings lack the type of precision that the Court might prefer, the Court cannot conclude that the Bankruptcy Court clearly erred in determining by a preponderance of the evidence that Wettach deposited at least $380,253.87 of his individual wages into the joint account during the lookback period. The Bankruptcy Court's conclusion in this regard is affirmed.

### C. Objectionable Expenditures

Wettach next argues that, because the Bankruptcy Court prorated his 2001 salary and determined that only 10.8% of the $376,358 that he earned that year fell within the lookback period, the remainder of his salary from 2001 comprised "entireties money that was available for non-necessary items." (Docket No. 4 at 12). Wettach contends that he should be permitted to offset the Trustee's award by this amount. However, he cites no caselaw in support of this proposition. (*Id.*). Indeed, a similar argument was recently rejected in *In re Arbogast* (with respect to a lookback period spanning from April 23, 2003 to April 23, 2007):

> [T]he Trustee bears the burden of preponderantly proving that post-April 23, 2007 disbursements were funded with pre-April 23, 2007 direct deposits. The Court concludes that the Trustee has not preponderantly proven as much. Consequently, the Court would be inclined to rule, without more, that the Trustee cannot potentially recover at all for any of those disbursements that . . . occurred subsequent to April 23, 2007.
>
> A related issue arises with respect to those disbursements . . . that occurred immediately subsequent to April 23, 2003 (i.e., the beginning of the lookback period). In particular, some of such disbursements were undoubtedly funded with direct deposits . . . that preceded April 23, 2003.
>
> That being said, the Court finds . . . [that] it is more likely than not that at least an equal amount of pre-April 23, 2007 direct deposits funded post-April 23, 2007 disbursements as pre-April 23, 2003 direct deposits funded post-April 23, 2003 disbursements. Therefore, the Court holds that the Trustee has preponderantly proven that those disbursements that

> were made . . . between April 23, 2003, and April 23, 2007 . . . derived from the direct deposits of the Debtor's wages.

*In re Arbogast*, 466 B.R. at 318-19 (holding that the Trustee was entitled to recover as fraudulent transfers all disbursements made within the lookback period that were funded from the joint account). This Court approves this analysis.

### D. Objections to Discharge

Wettach contends that, because his liability to Trizec will be discharged through his Chapter 7 bankruptcy proceeding, "any alleged or actual liability [he] might have had to the Trustee, including any liability under the Amended Complaint, will be fully and finally discharged." (Docket No. 4 at 13). Wettach concludes that, "[i]f there is no debt, by definition there can be no claim for fraudulent transfers." (*Id*.).

This argument has been repeatedly rejected by the courts. As previously noted, 11 U.S.C. § 544(b)(1) provides a Trustee with authority to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable [nonbankruptcy] law . . .". A related provision, 11 U.S.C. § 550(a), "permits a trustee to recover the value of transfers avoided under § 544." *In re Titus*, 498 B.R. at 524 (citing 11 U.S.C. § 550(a)). Significantly, "[l]iability under 11 U.S.C. § 550 is not affected by a bankruptcy discharge." *Id*. at 525; *see also In re Cohen*, 487 B.R. at 628 ("The discharge of the debtor has no impact on a judgment entered under § 550(a)") (citing *In re Moss*, 2004 U.S. Bankr. LEXIS 1190 (Bankr. N.D. Tex. Aug. 12, 2004)); *In re Oberdick*, 490 B.R. 687, 699 (Bankr. W.D. Pa. 2013) (concluding that a debtor's discharge does not extinguish his potential liability for fraudulent transfers). The Bankruptcy Court did not err in agreeing with established caselaw in this regard.

### E. Objections to Individual Expenses

Having concluding that Wettach transferred his individual wages into an entireties account, the Bankruptcy Court proceeded to address whether the Trustee had carried his burden of proving that portions of those wages were not spent on necessary household expenses. As previously noted, such deposits are not recoverable if they are "used to satisfy reasonable and necessary expenses for the maintenance of said debtor's family." *In re Meinen*, 232 B.R. at 842.[5] Wettach challenges the Bankruptcy Court's factual conclusions with respect to several discrete categories of expenditures, each of which is addressed below.

#### 1. Entertainment and Travel Expenses

Wettach maintains that the Bankruptcy Court erred by finding him liable for "unexplained entertainment and travel expenses" totaling $48,476.22 despite that he "clearly testified that at least 85% of these expenses were business related, and that he received reimbursement for such expenses from his client or his firm." (Docket No. 4 at 13). At trial, Wettach was asked to look through a list of travel expenses totaling $75,476.22 and determine whether any on the expenses were business related. (Docket No. 1-22 at 105). Wettach responded that he was "pretty sure" that "[p]robably 85 percent of them would be." (*Id.*). He also testified that he was certain that he had been reimbursed by a client for $27,000 of those expenses. (*Id.* at 106). However, he indicated that he could not verify that amount, or any other

---

[5] Wettach urges the Court to adopt an alternative standard that would find such transfers to be fraudulent only to the extent that the transferred funds were subsequently spent on "luxuries." (Docket No. 4 at pp. 22-23). This standard, initially propounded by a Pennsylvania common pleas judge in a related case, has been rejected by both the Third Circuit and numerous bankruptcy and district courts in this district. *See Arbogast*, 533 Fed. Appx. at 157 (finding no authority to support the proposition that "reasonable and necessary expenses" means "expenses for anything other than luxuries"); *In re Titus*, 498 B.R. at 517-18 (same); *Cohen*, 487 B.R. at 631 (same).

business-related expenses, without entering additional evidence into the record. (*Id*. at 108). That prompted the following exchange:

> Q: All right. So I'm going to presume . . . that you're going to produce evidence that you've just referred to relating to the fact that some of these were business related, and some of those business related expenses were reimbursed?
>
> A: That's correct.

(*Id*. at 108-09). Despite this representation, no additional evidence concerning Wettach's travel and business expenses was ever produced.

The Bankruptcy Court ultimately credited Wettach's testimony that $27,000 of the travel expenses discussed at trial had been business related, but ruled that the remaining $48,476.22 could be recovered by the Trustee. In reaching that conclusion, the Bankruptcy Court reiterated that, "[although] the Trustee has the overall burden of proof, the [Wettachs] have the burden of providing at least some useful evidence to show what transferred funds were spent on, and if they failed to do so the Trustee will be presumed to have met his burden." (Docket No. 1-28 at 25). The Bankruptcy Court determined that the Wettachs had failed to meet this burden of production because "evidence which could have proven" the truth of their assertions "was readily at hand" but was not presented. (*Id*. at 27). In light of this failure, the Bankruptcy Court afforded "no weight" to Wettach's unsupported testimony that 85% of his travel expenses were business related. (*Id*.).

The Bankruptcy Court's conclusion is both factually supported and consistent with caselaw in this district. In *In re Cohen*, for example, the debtor similarly testified that, although he could not recall precisely what certain funds were used for, they were used for necessities. *In re Cohen*, 487 B.R. at 624. The district court, on appeal, held that the Bankruptcy Court had not

erred in affording this testimony "no weight" in light of the debtor's failure to substantiate his testimony with evidentiary support or specificity. *Id*. We reach the same conclusion here.

### 2. Automobile Expenses

The Bankruptcy Court held that the Trustee could recover $76,975 in unnecessary and excessive automobile expenses out of a total of $134,706.02 incurred by the Wettachs during the lookback period. At trial, Wettach testified that he and his wife owned seven motor vehicles: five BMWs, a Ford F-150 Truck, and a Fiat Spider, each of which was operable and insured. (Docket No. 1-22 at 87-90). Wettach testified that he valued each of the cars equally – at $12,000 apiece – because it "looked like a good average." (*Id*. at 87). He provided no other testimony to explain to which of the seven cars the majority of his automobile-related expenses pertained.

The Bankruptcy Court reasoned that expenses for no more than three vehicles for a two-person household could be considered necessary. In the absence of any evidence indicating to which vehicles any particular expenses were devoted, the Bankruptcy Court relied upon the proportional method that Wettach had used in valuing his vehicles: it apportioned the expenditures equally among all seven vehicles and awarded the Trustee expenses for four of them. (Docket No. 1-28 at 28-29). Although Wettach contends that this method was improper for various reasons, including that some of the vehicles were seldom used and rarely generated expenses, none of the facts relied upon by Wettach in his appellate brief were introduced at trial or appear elsewhere in the record. (Docket No. 4 at 14-15). Accordingly, the Bankruptcy Court did not clearly err in relying upon Wettach's own valuation method to apportion costs between the necessary and unnecessary vehicles, given the record before it.

### 3. Home Completion Expenses

The Bankruptcy Court awarded the Trustee $167,297.65 in unnecessary home improvement expenses. Prior to 2002, the Wettachs' home – originally built in 1994 – consisted of a living room, dining room, kitchen, den, four bedrooms, three bathrooms, and a garage. (Docket No. 1-28 at 29). The record reflects that, during the lookback period, the Wettachs used funds from their joint account to add an art studio, a home office, a fourth bathroom, an additional garage, a finished basement, and extensive landscaping. (Docket No. 1-22 at 22-23, 32-35, 144). The Bankruptcy Court did not clearly err in determining that these additions to an already habitable home were not "necessary."

### F. Miscellaneous Arguments

In addition to the allegations of error discussed above, the Wettachs raise several grounds for appeal that are simply unsupported or have been universally rejected. These assertions warrant little discussion.

First, Wettach contends that the Bankruptcy Court erred in determining that his deposits into the joint checking account were not supported by fair consideration because his wife "also deposited all of her earnings into the parties' marital account." (Docket No. 4 at 22). Specifically, Wettach avers that, "during the early years of their marriage, Bette Wettach was the family's sole means of support" and that she received at one time "a substantial inheritance from her mother which she also deposited into the marital account." (*Id.*).

While it is true that a spouse's contributions to a jointly owned account may provide "dollar-for-dollar" consideration for corresponding deposits by the debtor, *see In re Oberdick*,

490 B.R. at 710, the record in the instant case clearly established that Bette Wettach's inheritance and gainful employment each occurred long before the commencement of the lookback period. (Docket No. 1-22 at 119, 162). Indeed, both Wettach and his wife consistently testified that Bette Wettach did not earn any income or make any deposits into the account during that time. (*Id*.). The Bankruptcy Court did not err in this regard.

Wettach next asserts that the Bankruptcy Court improperly awarded the Trustee $9,350 in severance benefits that Wettach received from Cohen & Grigsby in 2011. (Docket No. 4 at 18). Wettach points out that a claim for severance benefits was never pleaded in the amended complaint and maintains that, because the severance payment occurred in 2011, more than four years after the filing of his bankruptcy petition, "there is no sound basis" to include that payment as part of the estate. (*Id*.). However, as noted by the Bankruptcy Court, Wettach implicitly consented to the inclusion of the severance benefit at trial by failing to raise any objection. *See* Fed. R. Bankr. P. 7015 (incorporating Fed. R. Civ. P. 15) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."). Moreover, the Bankruptcy Court correctly determined that Wettach had a contractual right to the pre-petition portion of his severance payment at the time that his petition was filed, rendering it property of the estate. *See, e.g., In re Booth*, 260 B.R. 281, 285 (6th Cir. BAP 2001) (noting that courts have "almost uniformly adhered to the view that contingent property interests are property of the estate under § 514(a)(1)"); *In re Ryerson*, 739 F.2d 1423, 1425-26 (9th Cir. 1984) (post-petition severance payment was property of the bankruptcy estate to the extent that the payment was related to pre-petition services); *In re LaSpina*, 304 B.R. 814 (Bankr. S.D. Ohio 2004) (post-petition severance payments are estate property provided they are rooted in a pre-bankruptcy relationship).

Wettach also suggests that the Bankruptcy Court erred by allowing the Trustee to recover $52,805 that Wettach transferred to his wife from their joint bank account for the purpose of paying ordinary household expenses. (Docket No. 4 at p. 17). Although it is not entirely clear, Wettach appears to be arguing that the Bankruptcy Court miscalculated the portion of those funds that were ultimately spent on unnecessary expenses. However, Wettach has not provided any support for this position. In any event, the Bankruptcy Court's findings in this regard appear to be well-supported and are not clearly erroneous. (Docket No. 1-28 at 20).

Finally, Wettach contends that the routine deposit of wages into a jointly owned bank account does not constitute a "transfer" of an "asset" under the PUFTA. This proposition has been universally rejected. *See, e.g., In re Cohen*, 487 B.R. at 632 (acknowledging that "the direct deposit of funds constitute[s] a transfer under the [PUFTA]"); *In re Arbogast*, 479 B.R. at 667 (same); *In re Oberdick*, 490 B.R. at 703 (same); *In re Meinen*, 232 B.R. at 842 (same).

### G. Prejudgment Interest

After receiving a favorable judgment in the amount of $428,868.12 by way of the Bankruptcy Court's March 26, 2013 order, the Trustee filed a motion seeking an additional $98,963.93 in prejudgment interest. On November 12, 2013, the Bankruptcy Court issued an Order awarding $37,139.01 in prejudgment interest. The Wettachs contend that this award is contrary to law. The Court reviews this issue *de novo*.

Under Pennsylvania law, prejudgment interest is awardable as a matter of right in contract cases. *See Fina v. Fina*, 737 A.2d 760, 770 (Pa. Super. 1999). In other cases, prejudgment interest is an equitable remedy awarded at the discretion of the trial court. *See Somerset Cmty. Hosp. v. Allan B. Mitchell & Assoc*, 685 A.2d 141, 148 (Pa. Super. 1996). In

cases where there is no established precedent, the Pennsylvania Supreme Court has encouraged a flexible approach to determining whether to award prejudgment interest. *See Murray Hill Estates, Inc. v. Bastin*, 276 A.2d 542, 545 (Pa. 1971). Courts have frequently considered the following four factors in making this determination: (1) whether the claimant has been diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; and (4) whether the award of prejudgment interest is otherwise equitable or whether countervailing equitable considerations militate against such an award. *See In re Blatstein*, 260 B.R. 698 (E.D. Pa. 2001) (citing *American Mut. Liability Ins. Co. v. Kosan*, 635 F. Supp. 341, 346 (W.D. Pa. 1986)).

In awarding prejudgment interest, the Bankruptcy Court carefully considered each of the aforementioned factors before determining that an award was appropriate. Citing several Pennsylvania cases, the Bankruptcy Court noted that prejudgment interest is particularly appropriate where "a defendant holds money or property which belongs in good conscience to the plaintiff, and the object of the court is to force disgorgement of his unjust enrichment." *Kaiser v. Old Republic Ins. Co*., 741 A.2d 748, 755 (Pa. Super. 1999) (quoting *Dasher v. Dasher*, 542 A.2d 164, 164-65 (Pa. Super. 1988)). The Bankruptcy Court "[had] little difficulty analogizing the fraudulent transfer claims against the [Wettachs] to an unjust enrichment situation in that the essential allegation is that the [Wettachs] were holding or had used money that rightfully belonged to the bankruptcy estate." (Docket No. 1-40 at 12).[6] Consequently, the Bankruptcy Court concluded that the second and third factors cited above each strongly favored an award of prejudgment interest. However, the Bankruptcy Court reduced the requested award significantly after considering the fourth factor and determining that the progression of the

---

[6] For the same reason, the Bankruptcy Court properly distinguished the Wettachs' argument that Pennsylvania law prohibits an award of prejudgment interest in a "tort action" where damages are unliquidated.

adversarial proceeding to trial had been delayed significantly by factors outside of the Wettachs' control. (*Id*. at 13-14).[7]

On review, the Court concludes that the Bankruptcy Court appropriately applied Pennsylvania law in arriving at the discretionary decision to award prejudgment interest. Simply put, the Bankruptcy Court correctly cited the pertinent factors and applied them to the facts at hand. Moreover, such an award is not without precedent in fraudulent transfer actions in Pennsylvania. *See, e.g., Tiab Comm. Corp. v. Keymarket of Nepa, Inc*., 263 F. Supp. 2d 925, 947-48 (M.D. Pa. 2003) (awarding prejudgment interest in a PUFTA case after considering the four factors outlined above); *In re Blatstein*, 260 B.R. at 721-22 (remanding to the Bankruptcy Court with instructions to consider an award of prejudgment interest in a fraudulent transfer action). Accordingly, the Bankruptcy Court's November 12, 2013 Order awarding prejudgment interest is affirmed.

## V.  CONCLUSION

Based on the foregoing, the Wettachs' appeal is DENIED and the March 26, 2013 Order of the Bankruptcy Court is AFFIRMED. An appropriate Order follows.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

CC/ECF:     All parties of record.
Date:       June 3, 2014

---

[7] In particular, the Bankruptcy Court noted that the unexpected death of Judge M. Bruce McCullough, to whom the action had been initially assigned, and the retirement of Judge Bernard Markovitz, to whom it was initially transferred, had resulted in "at least two years of delay." (Docket No 1-28 at p. 13). Several other delays were occasioned by the parties' good faith efforts to mediate the claims and the overall complexity of the various cases involving the former Titus firm's partners.